**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **REGINALD KELLEY,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | **No. 3:10-CV-2574-M** |
| | § | |
| **COMMISSIONER OF THE** | § | |
| **SOCIAL SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

This is an appeal from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying the claim of Reginald Kelley ("Plaintiff") for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the "Act"). The Court considered Plaintiff's Brief, Defendant's Brief, and Plaintiff's Reply Brief. Additionally, the Court reviewed the record in connection with the pleadings. The Court recommends that the final decision of the Commissioner be reversed and remanded for further consideration.

**Background**[1]

**Procedural History**

On November 14, 2007, Plaintiff filed an application for SSI benefits, alleging disability beginning April 22, 2004. (Tr. 15.) The claim was denied initially on February 12, 2008, and upon reconsideration on August 15, 2008. (*Id*.) Plaintiff filed a written request for hearing on October 30, 2008, and appeared at a hearing held on November 2, 2009, in Dallas, Texas. (Tr. 15.) The ALJ decided that Plaintiff was not able to perform his past relevant work. However, the ALJ found that considering his age, education, work experience and residual functional capacity ("RFC"), there are

---

[1] The following background facts are taken from the transcript of the administrative proceedings, which is designated as "Tr."

jobs that exist in significant numbers in the local and national economies that Plaintiff can perform. (Tr. 20.)

On February 2, 2010, Plaintiff filed a timely request for review which the Appeals Council denied on October 21, 2010. (Tr. 1, 6.) Plaintiff's timely complaint was filed in this Court on December 17, 2010.

### Plaintiff's Age, Education, and Work Experience

Plaintiff was born on November 30, 1964; he was 42 years old when he filed for disability benefits and 44 years old at the time of the hearing. (Tr. 20, 34.) The Act defines persons who are 18-49 years old as younger individuals. 20 C.F.R. § 416.963. Accordingly, Plaintiff meets the definition of a younger individual. Plaintiff has a high school education. (Tr. 35.) Plaintiff has past relevant work as a furniture mover. (Tr. 20.)

### The Hearing

Plaintiff testified at the hearing on November 2, 2009, as did Russell Bowden, a Vocational Expert (VE). (Tr. 30.) Attorney Daniel A. Skaar represented Plaintiff at the hearing. (*Id.*)

### Plaintiff's Testimony at the Hearing

Plaintiff testified to his background information and work history. (Tr. 34-41.) Plaintiff also testified about his pain and daily activities. Plaintiff told the ALJ that, with painkillers, his pain averaged eight or nine on a scale of one to ten. (Tr. 46.) He testified that he sometimes takes more pain killers in one day than are prescribed; however, other days he takes less and never gets his prescriptions refilled early. (Tr. 47-48.)

The ALJ questioned Plaintiff about the back pain reflected in his records. (*Id.*) Plaintiff testified to pain right in the middle of his back. He reported that he has back and leg pain daily and

helps relieve it by lying down about half the day with a heating pad and changing positions. (Tr. 49.) Plaintiff testified that he sees that his 12 and 9-year-old sons get dressed on time and that they get out to the bus stop. (*Id*.)  He has tried to wash a few dishes by leaning over on the sink.  He does not vacuum, but occasionally has swept the floor.  His wife does the grocery shopping, laundry, and cooking. (Tr. 50-51.) He can lift a gallon of milk and pour milk, dress himself except for his shoes and socks, and bathe.  (*Id*.)  He uses a grabbing tool to pick things up, and he does not bend.  He sleeps on his right side with a pillow between his legs. (Tr. 54.)  He goes to church but sits in the back where he is allowed to get up to stretch.  (*Id*.)  He uses his cane most of the time, except in the bathroom where he can lean on things. (Tr. 55.)

Plaintiff testified that although he used marijuana in the past, he stopped using it two months before the hearing, based on his doctor's orders. (Tr. 60.) He stated that he regularly reports for lab tests to assure his compliance with his doctor's orders.  (*Id*.)

### The VE's Testimony at the Hearing

The ALJ asked the VE to consider a hypothetical individual of Plaintiff's age, education and work history who could lift 20 pounds occasionally and 10 pounds frequently.  The person could stand and walk two out of eight hours.  The individual could sit for six of eight hours and occasionally climb ramps or stairs, but could not climb ladders, ropes or scaffolds.  The person could not balance, crouch, or crawl, and was unable to work in proximity to hazards, including moving machinery or unprotected heights.  The individual could not drive a vehicle.  The reasoning level for

math and language would be two, one, one.[2]  The ALJ asked the VE if such an individual could

perform Plaintiff's past work, and the VE testified that the person could not.  (Tr. 65.)

The ALJ inquired if there would be other work such an individual could perform.  (*Id*.)  The

VE opined that the hypothetical individual could perform virtually every occupation in the unskilled

sedentary occupational base, which consisted of 120,000 jobs in Texas and 1.2 million jobs in the

national economy. (Tr. 66.)  The VE testified that the additional restriction of the use of a cane for

ambulation would have little or no impact on the number of performable occupations in the original

hypothetical.  (*Id*.)

On cross-examination, the VE testified that an individual who could not sit for two hours and

stand for two hours in an eight-hour day, would not qualify for competitive employment.  (Tr. 70.)

The VE also stated that if an individual had to change positions every 10 to 20 minutes, all jobs

---

[2]  This means a reasoning development of 2, mathematical development of 1 and language
development of 1.  (RML 2-1-1).  Appendix C of the *Dictionary of Occupational Titles* ("DOT")
states that a reasoning development of 2 refers to the ability to apply commonsense understanding
to carry out detailed but uninvolved written or oral instructions and deal with problems involving
a few concrete variables in or from standardized situations.  A mathematical development of 1 refers
to the ability to add and subtract two digit numbers; multiply and divide by 10's and 100's by 2, 3,
4, 5; perform four basic arithmetic operations with coins as part of a dollar; and perform operations
with units such as cup, pint, quart, inch, foot, yard, ounce, and pound. Language development of 1
refers to the ability to recognize the meaning of 2,500 words; read at a rate of 95-120 words per
minute; compare similarities and differences between words and between series of numbers; print
simple sentences containing subject, verb, object, and series of numbers, names, and addresses; and
speak simple sentences using normal word order, and present and past tenses.

would be precluded.  (*Id.*)  The VE testified that an employer's tolerance for absenteeism would be two days a month, at the most.  (Tr.  67.)

## The ALJ's Decision

The ALJ issued a December 16, 2009 decision, determining that Plaintiff had not performed substantial gainful activity (SGA) since his alleged date of disability of November 14, 2007, and that Plaintiff suffered from severe impairments that included a history of total left hip replacement, obesity, and substance abuse.  (Tr. 17).  *See Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985). The ALJ also found that Plaintiff's depression and asthma were not severe impairments under *Stone*. (Tr.  19.) The ALJ did not mention Plaintiff's lumbar spine impairment.  (*Id.*)  The ALJ also found that Plaintiff's impairments, taken individually or in combination, did not meet, or medically equal, the criteria for Listing 1.02 for major dysfunction of a joint. (Tr. 17); 20 C.F.R. § 404, subpt. P, App. 1.[3]

The ALJ found that Plaintiff had an RFC which would allow him to:

lift or carry twenty pounds occasionally, ten pounds frequently, stand and/or walk for two hours out of an eight hour workday, [and] sit for six hours out of an eight [h]our workday. This individual has the ability to climb ramps and stairs occasionally. This individual must avoid climbing ladders, ropes or scaffolds. This individual must avoid balancing, crouching or crawling. This individual has the ability to kneel occasionally and stoop frequently. This individual must avoid working in proximity to unprotected heights, hazardous moving machinery, or driving a vehicle. From a mental standpoint, the claimant retains the reasoning, mathematics, and language skills to perform work with understanding and carrying out detailed but uninvolved written or oral instructions dealing with problems involving a few concrete variables in or from standardized situations encountered on the job, performing basic arithmetic operations, and reading, writing, and speaking in simple sentences using normal work order (RML 2-1-1).

(Tr. 18.)

---

[3]App. at 2.

The ALJ found that Plaintiff did not have the ability to perform his past relevant work as a furniture mover because it was performed at heavy exertion levels.  (Tr. 64-65.)  Nevertheless, the ALJ found there were a sufficient number of occupations available in both Texas and the national economy that Plaintiff could perform given his RFC.  (Tr. 20-21.)  The ALJ concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, from his November 14, 2007 application through the date of the decision.  (Tr. 21.)

### Plaintiff's Medical Evidence Before His Total Left Hip Replacement

In the late 1990's, Plaintiff was involved in a motor vehicle accident which resulted in a fracture of the left side of his pelvis near the hip socket.  (Tr. 301, 303.)  To strengthen the fractured area, surgeons fixed a plate to Plaintiff's pelvis with a number of screws.  (Tr.  300-301.) Plaintiff claimed he began to experience increasing problems with ambulation which resulted in a series of falls.  He sought treatment and narcotic medication for hip and lumbar pain at the Parkland Hospital Emergency Room on many occasions.  (Tr. 472-75; 441-44; 440, 457-59; 396; 427-30, 436-40; 431–33; 434-35; 425; 423-24; 415; 420-21; 389; 392-93; 386; 388; 383; 382; 378; 376; 372; 374; and 371.)

In February and March of 2007, Plaintiff went to the emergency room at Doctor's Hospital of Dallas.  (Tr. 283, 291.) He appeared to be distressed and  reported experiencing severe sharp and shooting low back pain.  (*Id*.)  His range of motion was intact in all extremities.  (*Id*.)  The doctor prescribed hydrocodone.  (*Id*.)  X-rays of his lumbar spine on February 13, 2007, revealed the lumbar vertebrae were normal in height and posterior alignment.  (Tr. 298.)  The disc spaces were well maintained; osteophytes were observed at L2-L3 and at several other levels of the thoracic spine.  (*Id*.)  The impression was "scattered degenerative changes with no specific acute process."  (*Id*.)

Plaintiff went to Doctor's Hospital Emergency Department in December 2007, after he had suffered another fall that caused his hip pain to become worse. (Tr. 281.) X-rays taken of his hip at Doctors Hospital on November 26, 2007 had revealed no acute osseous abnormalities in the left femur and no change from previous findings of arthritic disease with narrowing of the joint space and sclerosis on either side of it. (Tr. 300, 301.)

In January of 2008, Plaintiff went to Julius Wolfram, M.D., for an initial physical consultative examination. (Tr. 302-308.) Plaintiff reported he experienced constant left hip pain that increased with movement, with sitting for longer than 30 minutes, with standing or with walking for more than 10 minutes; he reported that medication does not significantly reduce the chronic pain. (Tr. 303.) The physical exam revealed that Plaintiff's spine was supple and tender in the lumbrosacral area. (*Id.*) Plaintiff could not perform a straight leg raise with his left leg; he ambulated with a pronounced limp favoring his left leg; his left hip area was tender without redness or swelling but with indirect tenderness as well. (*Id.*) He was unable to perform passive flexion, rotation, or abduction on the left side because of severe pain in the left hip area. (Tr. 304-305.) Plaintiff's gait and stance were normal. (*Id.*) Toe, heel, and tandem walking was accomplished without difficulty, as was getting on and off the exam table. (*Id.*) Dr. Wolfram's impression was "residua of fracture of left hip with need for second operative procedure with use of screws which are still in place." (*Id.*) Dr. Wolfram noted that there had been no hip replacement and that Plaintiff did not need an assistive device. (*Id.*) Dr. Wolfram stated that Plaintiff had a history of bronchial asthma and a history highly suggestive of arterial sclerotic heart disease with unstable angina. (Tr. 305.)

Plaintiff was seen at University of Texas Southwest Hospital in the first part of 2008 for increasing left hip, thigh, and groin pain. (Tr. 321-340.) Robert W. Bucholz, M.D., examined

Plaintiff in April of 2008, noting that Plaintiff's hip pain "[was] quite severe and [had] affected the quality of his life and his ability to perform his daily activities." (Tr. 324.)  Dr. Bucholz diagnosed primary localized osteoarthritis, pelvic region and thigh, with severe hip pain. (Tr. 325.)  Physical exams performed by Dr. Bucholz evidenced a reduced range of motion in his left hip; difficulty ambulating and heavily favoring his left leg; swelling and tenderness of his left hip and thigh; and the inability to stand on his left leg. (Tr. 324, 326, 328, 334, 336.) X-rays indicated no significant radiographic abnormality of the right hip.  (Tr. 334.)  Treatment with pain medication and steroid injections had failed to bring Plaintiff any significant relief from his chronic, severe pain, and the pain had substantially interfered with Plaintiff's ability to perform activities of daily living and work-related functions. As a solution to Plaintiff's chronic pain, Dr. Bucholz recommended that Plaintiff undergo a complete hip replacement.  (Tr. 324, 326, 530.)

### Medical Records After Total Left Hip Replacement Surgery

On May 30, 2008, Dr. Bucholz performed total left hip replacement surgery on Plaintiff and discharged him from the hospital two days later.  (Tr. 530, 533.)  Two weeks after the surgery, Plaintiff complained of moderate operative and surgical pain.  (*Id*.)  His dilated pupils suggested that he might be on drugs.  (*Id*.)  Four to five weeks after Plaintiff's left hip had been totally replaced, Plaintiff had been doing very well and was very pleased with the results of his surgery.  (Tr. 483.) He said that the pain that he was having before the surgery had largely subsided.  (*Id*.)  X-rays taken two months after the surgery indicated the hardware was properly placed and did not appear loose. Although Plaintiff's hip socket (acetabulum) had not yet fully seated, the doctor explained that this area would fill in over time and stated the overall position of the components was excellent.  (Tr. 484.)  Plaintiff's surgeon pronounced a satisfactory recovery following the total left hip placement

8

surgery and told Plaintiff he was not going to prescribe anything more than Darvocet.  (Tr.  481.)
The doctor was concerned about drug addiction and strongly encouraged Plaintiff to follow up with
the pain management team.  (*Id*.)  In July, after Plaintiff had completed his physical therapy, Dr.
Bucholz prescribed a cane for Plaintiff.  (Tr.  524.)

Also in July of 2008, Dr. Ceciler Chen conducted a second consultative examination.  (Tr.
342-345.)  Plaintiff reported that he had not felt any better after the total hip replacement surgery.
(Tr.  342.)  Plaintiff also reported he had completed all of the physical therapy that he could afford,
with no improvement in his chronic pain level.  (*Id*.)  Plaintiff reported that he smoked marijuana
occasionally.  (*Id*. 343.)  Dr.  Chen's physical examination found no swelling in Plaintiff's joints, no
deformity, no crepitation, no heat or redness, and no effusion.  (*Id*.)  Plaintiff had muscle atrophy of
the left leg, an inability to heel or toe walk, difficulty squatting, and ambulation required a walker
device.  (*Id*. 343-345.)  Additionally, no range of motion or orthopedic testing could be accomplished
due to the May 2008 surgery.  (Tr. 344.)

After Plaintiff's hip replacement surgery, Dr. Dan Sepdham became Plaintiff's primary care
physician.  (Tr. 537-623.)  In June of 2008, Plaintiff went to Dr.  Sepdham for management of his left
hip pain.  Subjectively, Plaintiff complained of continuous sharp hip pain on his left side rated at a
3/10 intensity with some radiation into his groin area; he said the pain significantly increased any
time his knees touched.  (Tr. 550.)  He reported that he had been out of work for three months
because of his condition.  (*Id*.)  He had been driving a truck for a furniture moving company and
sometimes moving furniture.  (*Id*.)  Objectively, the patient appeared well, in no apparent distress.
 (*Id*.)  Dr.  Sepdham's physical examination of Plaintiff  revealed no erythema; no exudate; a small
amount of swelling (edema) and significant tenderness over the greater trochanter area of his hip.

9

(*Id*.)  Plaintiff ambulated slowly with a walker.  (*Id*.)  Plaintiff told Dr. Sepdham that he was planning to go on vacation to Palestine, Texas.  (*Id*.)

Dr. Sepdham saw Plaintiff in August of 2008, and noted that Plaintiff did not react well to the advice of the doctors at the pain management clinic, particularly their conclusion that he needed to be on amitriptyline for depression.  (Tr. 548.)  Plaintiff expressed a continued need for hydrocodone, stating that he used about four tablets a day and has had 15 previous prescriptions for narcotic pain medicine since February of 2008.  (*Id*.)  Dr. Sepdham described Plaintiff as angry, and noted that he ambulates with a cane and limps.  (Tr. 549.)  Dr. Sepdham diagnosed Plaintiff's hip pain as "stable" and convinced him to start amitriptyline.  (*Id*.)  In return, the doctor agreed to prescribe hydrocodone one time with no refills.  (*Id*.)  Plaintiff signed a pain contract, expressing his understanding that the doctor would not refill his medications early, even if something happened to them.  (*Id*.)  Plaintiff expressed his desire for a second opinion from a different orthopedist and the doctor agreed to try to locate someone for him.  (*Id*.)

In October of 2008, Plaintiff reported that since he started amitriptyline at his last visit, his hip pain had been much more manageable, and he was walking without a cane.  (Tr. 547.)  He still took four hydrocodone per day.  (*Id*.)  Plaintiff was dressed in a suit and his mood was "jovial."  (*Id*.)  Plaintiff told Dr. Sepdham that he planned to travel to Tennessee for about a month for some work and wanted to know how his medication needs would be handled.  (*Id*.)  The doctor prescribed enough medication for two months to cover the trip and told Plaintiff to return for his next appointment in two months.  (*Id*.)

Plaintiff returned to Dr. Sepdham in December 2008 for his next appointment and to get his medication refilled.  (Tr. 544.)  The doctor said that Plaintiff's pain remained manageable with his

10

amitriptyline and hydrocodone and noted his marijuana use had decreased to once per month.  (*Id*.)
Plaintiff reported that some days he took four tablets of hydrocodone and other days he did not need
any at all and that his left leg was "mainly sore when driving."  (*Id*.)  Plaintiff appeared alert, well
developed, well nourished, and in no distress.  (Tr. 545.)  The treating physician described his gait
as "slightly limping."  (*Id*.)

In January of 2009, Dr. Sepdham completed an evaluation of Plaintiff's ability to perform
work-related activities. (Tr. 539.) Dr. Sepdham found that, due to a diagnosis of osteoarthritis of
pelvis and thigh, Plaintiff was incapable of full time employment, but could work twenty hours per
week with restrictions.  Dr.  Sepdham stated that Plaintiff could sit for four hours of an eight-hour
workday, and stand for two hours of an eight-hour workday. However, Plaintiff could not walk,
climb, kneel, squat, bend, stoop, push/pull, lift or carry for any significant length of time and was
limited to lifting a maximum of ten pounds for more than two hours a day. (Tr. 539.)

Dr. Sepdham's progress notes in February 2009 show that Plaintiff was working again and
avoided taking medicine at work.  Plaintiff took acetaminophen and amitriptyline before work; he
took one dose of hydrocodone at lunch; and he took three doses of hydrocodone after work.  (Tr.
542.) He was alert and in no distress.  (*Id*.)  Plaintiff wanted to try oxycodone, and Dr.  Sepdham
prescribed it as his next new prescription.  (*Id*.)   Dr.  Sepdham diagnosed "Primary Localized
Osteoarthrosis of the Pelvic Region and Thigh" and told him to return in three months.  (*Id*.)

In March of 2009, Dr. Sepdham completed another assessment of Plaintiff's ability to perform
work-related functions. (Tr. 558-60.) He found that Plaintiff could lift and carry 10 pounds
frequently; stand and walk less than two hours of an eight-hour workday; must alternate from a sitting
or standing position every 20 minutes at will; could occasionally twist, kneel, crawl and balance, but

could never stoop, crouch, or climb. (Tr. 558-59.)  Finally, Dr. Sepdham found that Plaintiff's impairments would cause him to be absent from full-time employment two days per month, and in Dr. Sepdham's opinion, Plaintiff was not capable of performing a full-time job, that is, eight hours per day, five days per week, on a regular and continuing basis.  (Tr. 560.)

On May 27, 2009, Plaintiff was treated at the ER at Presbyterian Hospital of Dallas.  (Tr. 595.)  Plaintiff complained of constant severe headache in the back of his head, tooth pain, and left hip pain.  (Tr. 596.)  The ER physician, Ramona Spruell, M.D., found that Plaintiff has a normal range of motion and his left hip is normal.  (Tr. 597.)  The doctor found no edema, no tenderness, no swelling, no crepitus, no deformity and no laceration.  (*Id*.)  However, the doctor noted Plaintiff exhibited "pain with left leg raise-secondary to left hip." (*Id*.)  The doctor diagnosed "Hypertension, Cervical Strain, and Hip Pain." (*Id*.)

Plaintiff began to have chronic headaches, and in May of 2009, he underwent a CT scan of his brain in an effort to diagnose the cause of the headaches.  (Tr. 607.)  The scan revealed "no acute intracranial abnormality," but indicated sinus inflammation and prominence of the adenoid gland. (*Id*.)  An X-ray of his cervical spine showed: "a mild reversal of the normal lordotic curvature likely secondary to degenerative disk disease in the lower cervical spine." (Tr. 604.)  No evidence of subluxation was seen, and the prevertral soft tissues were of normal appearance.  (*Id*.)  The results also indicated abnormal bony projections on the front of the spine at multiple levels, and a suggestion of loss of disc height at C6-C7. C7-T1 were not visualized well.  (*Id*.)  The X-ray showed "no acute process." (*Id*.)

In June of 2009, Dr. Sepdham voiced his concerns about Plaintiff's overuse of hydrocodone. (Tr. 583.)  As a result, in July of 2009, Dr. Sepdham administered steroid injections into Plaintiff's

12

hip in an attempt to bring more permanent pain relief outside his constant narcotic painkillers.  (Tr. 576-77.)  Plaintiff fell in early September of 2009 causing a sprained ankle and a possible torn tendon in his repaired hip area. (Tr.  571.)  Later in September 2009, Plaintiff reported to Dr. Sepdham that he was having left ankle pain which started after a recent arrest for outstanding traffic tickets and that his left hip pain worsened as a result of his visit to the jail.  (Tr. 564.)  His narcotics were confiscated at the jail.  (*Id*.)  Plaintiff continued to report the use of marijuana.  (Tr.  567.)  Dr.  Sepdham noted that Plaintiff's hip pain and ankle pain were stable.  (Tr. 565.)  Plaintiff's last physical exam in September of 2009 revealed continuing left hip pain which Dr.  Sepdham diagnosed as "chronic pain following surgery or procedure."  (Tr. 566.)  Plaintiff also had ankle pain for which Dr.  Sepdham prescribed a crutch and ankle splint.  (*Id*.)

In October of 2009, just prior to the hearing, Dr. Sepdham updated his professional opinion of Plaintiff's ability to perform work-related activities. (Tr. 686-88.)  He found Plaintiff able to lift and carry 10 pounds occasionally and less than 10 pounds frequently; stand and walk for less than two hours of an eight-hour workday; sit for less than two hours of an eight-hour workday, but would be required to change positions from standing and sitting at 15 minute intervals at will; occasionally stoop, climb stairs, kneel, and twist, but would be unable to crouch, climb ladders, crawl, or balance. (Tr. 686-87.)  Finally, Dr. Sepdham opined that Plaintiff was unable to sustain any type of full-time employment because the symptoms of his impairments would cause him to be absent greater than three days a month.  (Tr. 688.)

In August of 2010, after Plaintiff was denied benefits and while he was waiting for the Appeals Council review, Dr. Sepdham once again updated his opinion of Plaintiff's ability to perform work-related functions. (Tr. 690-92.) This assessment was partially consistent with the three previous

assessments, as he again found that Plaintiff could only lift and carry 10 pounds occasionally and less than 10 pounds frequently; was unable to stand for even two hours of an eight-hour workday, and could only sit for 20 minutes at a time before required to change position to standing. The assessment differed in that Dr. Sepdham found that Plaintiff's sitting was not impaired; however, the amount of time he could stand before needing to change positions was reduced to five minutes. Additionally, the frequency with which he would need to walk around was changed from every twenty minutes to every five minutes. Dr. Sepdham's opinion that Plaintiff must be allowed to change between sitting to standing at will was consistent with his last report. However, the new medical source statement added the opinion that Plaintiff would need to lie down at unpredictable intervals two-three times during each workday. (Tr. 690-91.) Additionally, the doctor found that Plaintiff could only occasionally stoop, twist, and balance, and would be unable to crouch, crawl, climb, or kneel, with a limited ability to perform pushing and pulling. (Tr. 691.) Dr. Sepdham stated that Plaintiff continued to have chronic left hip pain and tenderness, ambulated with an antalgic gait, and noted that "his pain remains moderately controlled at best and is often quite severe" and opined that Plaintiff "is incapable of the type of manual labor to which he was previously accustomed." (Tr. 692.) Finally, Dr. Sepdham once again expressed the opinion that Plaintiff would be absent from any attempt at full-time employment more than three days per month and remained incapable of performing sustained full-time employment. (*Id.*)

## Standard of Review

To be entitled to social security benefits, a plaintiff must prove that he is disabled for purposes of the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Abshire v.*

*Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled.  Those steps are:

1.   An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.   An individual who does not have a "severe impairment" will not be found to be disabled.

3.   An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.   If an individual is capable of performing the work the individual has done in the past, a finding of "not disabled" must be made.

5.   If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the inquiry, the burden lies with the claimant to prove his disability.  *Leggett*, 67 F.3d at 564.  The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies his burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be

satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C.A. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. However, "[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). Moreover, the terms of 20 C.F.R. § 404.1527 define "medical opinions" and instruct claimants how the Commissioner will consider the opinions.[4] In the Fifth Circuit, "the opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses,

---

[4] The terms of 20 C.F.R. § 404.1527(a)(2) provide:

> (2) Evidence that you submit or that we obtain may contain medical opinions. Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

should be accorded great weight in determining disability." *Newton*, 209 F.3d 448, 455 (5th Cir. 2000); *see Floyd v. Bowen,* 833 F.2d 529, 531 (5th Cir.1987).

## Issues

1.   Whether the ALJ Committed Reversible Legal Error by Failing to Properly Consider the Treating Physician's Medical Source Statements;

2.   Whether the Appeals Council Failed to Consider Additional Evidence Submitted After the Hearing;

3.    Whether the ALJ's Credibility Assessment is Based on Substantial Evidence.

4.   Whether the ALJ's RFC Assessment Contains Errors of Law and is Not Based on Substantial Evidence;

5.   Whether the ALJ Failed to Properly Evaluate the Plaintiff's Obesity; and

6.   Whether the ALJ's Listing Assessment Violated Binding Case Law;

## Analysis

### Whether the ALJ Committed Reversible Legal Error by Failing to Properly Consider the Treating Physician's Medical Source Statements

"A medical source's statement about what an individual can still do is medical opinion evidence that an adjudicator must consider together with all of the other relevant evidence (including other medical source statements that may be in the case record) when assessing an individual's RFC. . . . Adjudicators must weigh medical source statements under the rules set out in 20 CFR 404.1527 and 416.927, providing appropriate explanations for accepting or rejecting such opinions." (Social Security Ruling ("SSR") 96-5p.)

"The regulations recognize that treating sources are important sources of medical evidence and expert testimony, and that their opinions about the nature and severity of an individual's

impairment(s) are entitled to special significance; sometimes the medical opinions of treating sources are entitled to controlling weight." (POLICY INTERPRETATION: SSR 96-5p.)

When the ALJ determines a treating source opinion is not entitled to "controlling weight," the ALJ must consider the factors outlined in Section 404.1527(d) of the Administration's administrative regulations, including: the length of the treatment relationship, frequency of examination, nature and extent of the treating relationship, evidence supporting the opinions, the consistency of those opinions, and medical specialization. *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). *See* 20 C.F.R. § 404.1527(d)(2); SSR 96-2p, 96-5p.

### Dr.  Sepdham's Medical Source Statements

Plaintiff contends that the ALJ applied an incorrect legal standard in failing to give "controlling weight" to the medical source statements of his treating physician, Dr. Sepdham. (Pl.'s Br. at 13-14.)  Specifically, Plaintiff argues that had the ALJ properly considered his treating physician's medical source statements, the ALJ would have been compelled to find that Plaintiff was disabled.  (Pl.'s Br. at 15-17.)

In this case, the treating physician, Dr.  Sepdham, provided four medical source statements ("MSS").  These four statements assessed Plaintiff's ability to perform work related activities after his hip replacement surgery on May 8, 2008.  (Tr. 539, 558-61, 686-88, and 690-92.)   The first MSS was dated January 27, 2009 and the second was dated March 20, 2009.  (Tr.  539, 558-61.) The ALJ failed to address either of these treating source determinations.  The Commissioner argues that the ALJ "performed a thorough analysis of the entire record, including an analysis of opinion evidence pursuant to 20 C.F.R. § 416.927."  (Def.'s Br. at 6, citing Tr. 15, 17-20.)  The Court finds that although the ALJ made the conclusory statement that she had reviewed all of the medical records,

18

she failed to address Dr. Sepdham's first two medical source statements under the rules set out in 20

CFR 404.1527 and 416.927, or provide rational explanations for accepting or rejecting such opinions.

*See* SSR 96-5p.

The ALJ considered Dr. Sepdham's third MSS dated October 27, 2009 but gave it "less

weight."  (Tr.  20.)  The Commissioner contends that the ALJ did not give the medical source

statement controlling weight because it was an opinion on an ultimate issue reserved to the

Commissioner. (*Id*. 11.)  Opinions on issues reserved to the Commissioner are not medical opinions.

20 CFR § 404.1527 (e).  *See  Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir.  1995).  A statement by

a medical source that a claimant is "disabled" or "unable to work" does not require the Commissioner

to find that claimant disabled.  *See Barajas v. Heckler*, 738 F.2d 641, 645 (5th Cir. 1984) (a treating

physician's statement that an individual is disabled does not mean that he is disabled within the

meaning of the Act); 20 C.F.R. § 416.927(e)(1).  However, a medical source's statement about what

an individual can still do despite their medical impairments differs from an opinion by a treating

source that a patient is disabled.   "Medical source statements submitted by treating sources provide

medical opinions which are entitled to special significance and may be entitled to controlling weight

on issues concerning the nature and severity of an individual's impairment[s]."  SSR 96-5p at

*Medical Source Statement*; *See* 20 C.F.R. § 416913 (b)(6).

In this case, the ALJ did not base her decision to give Dr. Sepdham's medical source

statement less weight on the rationale that it was an opinion on an ultimate issues reserved to the

Commissioner.  Rather, she gave the opinion less weight because she found that the "opinion is

inconsistent with the medical evidence which shows that Plaintiff had the ability to work out of

town."  (Tr. 19.)  As the Court has stated, "[t]he ALJ's decision must stand or fall with the reasons

set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton*, 209 F.3d 448, 455 (5th Cir. 2000).

The record shows that on October 24, 2008, Plaintiff told Dr. Sepdham he would be working in Tennessee for a month. (Tr. 547.) At that time, Plaintiff walked without a cane and described his pain as tolerable. (*Id.*) However, on December 22, 2008, Plaintiff complained to Dr. Sepdham of left leg pain from driving. (Tr. 544.) Nevertheless, Plaintiff continued to walk without a cane and reported that he tolerated his chronic hip pain well after his amitriptyline was increased to 50 mg daily. (*Id.*) On March 18, 2009, Plaintiff told Dr. Sepdham he would be working out of town for three weeks and needed oxycodone for that period of time. (Tr. 593.)

The ALJ stated that she did not believe Dr. Sepdham's October 2009-medical source statement rating Plaintiff's limitations in his ability to do work-related activities because Plaintiff's medical records show that Plaintiff "had the ability to work out of town." (Tr. 20.) This finding is not supported by substantial evidence and is, in fact, contradicted by the ALJ's own determination that Plaintiff had not engaged in substantial gainful activity since November 14, 2007. (Tr. 17.) Despite the conflict with her own determination, the ALJ again used Plaintiff's "ability to work out of town" to discount Plaintiff's credibility, finding that Plaintiff's assertion of limiting pain is not credible because "the medical evidence shows that Plaintiff was able to travel out of town to work." (Tr. 19.)

The ALJ failed to mention or discuss Plaintiff's explanation at the hearing that the two attempts to work out of town failed because of his chronic hip pain, back pain, and leg pain from driving. Plaintiff testified that a friend of his who had out of town moving jobs scheduled was trying to let Plaintiff make some extra money for his family. (Tr. 37.) Plaintiff testified that the friend was

going to let him try to drive the moving truck on the friend's out of town jobs.  Plaintiff stated that he had failed at the two attempts because the loads were delivered late due to Plaintiff's having to stop frequently to get out and stretch.  (*Id.*)  The ALJ failed to discern that Dr.  Sepdham did not endorse Plaintiff's attempts to work out of town or show that Plaintiff had the ability to do so.  Rather, the medical records simply noted Plaintiff's requests for enough medication to cover his plans to work out of town.

Substantial evidence does not support the ALJ's  decision to give Dr. Sepdham's October 27, 2009 medical source statement less weight based upon Plaintiff's "ability to work out of town."  The ALJ committed legal error by failing to even discuss Dr. Sepdham's other two medical source statements.  The ALJ picked and chose only medical evidence that was supportive of a finding consistent with the conclusion that Plaintiff was not disabled.  The ALJ did not discuss or distinguish Dr. Sepdham's medical records which showed that even though Plaintiff complied with all of the recommended treatments, he continued to suffer severe chronic hip pain.  Dr. Sepdham's medical records indicated that he believed the prescriptions for narcotic painkillers were necessary to make Plaintiff's pain tolerable.  Dr.  Sepdham continued to supervise Plaintiff's treatment and required him to take regular lab tests to assure compliance with his orders.

The Court recommends that the District Court reverse and remand this case because the ALJ committed legal error in failing to properly consider Plaintiff's medical source statements and because the ALJ's opinion is not supported by substantial evidence.

**Whether the Appeals Council Failed to Properly Consider
New Evidence Submitted After the Hearing**

Dr. Sepdham's fourth medical source statement was signed on August 18, 2010 and presented to the Appeals Council after the ALJ's December 16, 2009 decision. (Tr. 690-93.) The Appeals Council stated that "it received additional evidence which it is making part of the record," specifically referring to the Medical Source Statement from Dr. Dan Sepdham dated August 19, 2010 (6 pages). (Tr. 5.) The Appeals Council stated that "in looking at your case, we considered the reasons you disagree with the decision and the additional evidence" previously listed. (Tr. 1.) The Appeals Council found that "this information does not provide a basis for changing the Administrative Law Judge's decision." (*Id.*) The Court finds that this was prejudicial legal error.

Claimants are informed that "[w]hen the Appeals Council makes a decision, it will follow the same rules for considering opinion evidence as administrative law judges follow." 20 C.F.R. § 404.1527(f)(3); *see also Newton v. Apfel,* 209 F.3d 448, 460 (5th Cir. 2000). Generally, the opinion of a treating source is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *Spellman v. Shalala,* 1 F.3d 357, 364 (5th Cir. 1993). Even when a treating source opinion is not given controlling weight, the opinion still is entitled to deference "and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.972." SSR 96-2p, 1996 WL 374188 at *4 (SSA Jul. 2, 1996). *See also Newton,* 209 at 456. Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating physician. 20 C.F.R. § 404.1527(d). In fact, when "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion

controlling weight.  *Id.*  A treating physician's opinion may be given little or no weight when good cause exists, such as when the treating physician's evidence is inconsistent with other substantial evidence, is conclusory, or is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques.  *Id.* at 455-56.

Evidence submitted for the first time to the Appeals Council is considered part of the record upon which the Commissioner's final decision is based.  *Higginbotham v. Barnhart,* 405 F.3d 332, 337 (5th Cir. 2005).  Retrospective medical opinions are valid.  *See Dousewicz v. Harris*, 646 F.2d 771, 774 (2d Cir. 1981) ("[A] diagnosis of a claimant's condition may properly be made even several years after the actual onset of the impairment." (quoting *Stark v. Weinberger*, 497 F.2d 1092, 1097 (7th Cir. 1974)).  Social Security regulations expressly authorize a claimant to submit new and material evidence to the Appeals Council when requesting review of an ALJ's decision.

> If the new evidence relates to a period before the ALJ's decision, the Appeals Council "shall evaluate the entire record including the new and material evidence submitted . . . [and] then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record."

*Perez v. Chater*, 77 F.3d 41, 44 (2d Cir. 1996) (quoting 20 C.F.R. § 404.970(b)).

Recent case law provides that if the Appeals Council has failed to properly evaluate new medical evidence which is so inconsistent with the ALJ's findings that it undermines the ultimate disability determination, the case should be remanded so that the Appeals Council fully can evaluate the treating source statement as required by law.  *See Brown v. Astrue*, No. 3-10-CV-00275-O-BK, 2010 WL 3895509, **4 -6 (N.D. Tex. Sept. 13, 2010) (remand required where the Appeals Council noted that it had considered the new evidence but the information did not provide a basis to change the ALJ's decision, yet the new evidence significantly conflicted with the ALJ's assessment of Plaintiff's work abilities); *Lee v. Astrue*, No. 3-10-CV-155 -BH, 2010 WL 3001904, at *7 (N.D. Tex.

July 31, 2010) (remanding to Commissioner for reconsideration where Appeals Council failed to specifically address new evidence that diluted the record to the point that Commissioner's determination was insufficiently supported); *Stewart v. Astrue*, No. 7-07-CV-052-BD, 2008 WL 4290917 *4 (N.D. Tex. Sept. 18, 2008) (remand required where no indication that Appeals Council evaluated treating source statement regarding claimant's ability to perform work-related activities and new evidence so inconsistent with ALJ's findings that it undermined ultimate disability determination); *see also Jones v. Astrue*, No. H-07-4435, 2008 WL 3004514 at *4-5 (S.D. Tex. Aug. 1, 2008) (remand required where summary denial of a request for review provided no indication that the Appeals Council evaluated the treating source statement as required by SSR 96-5); *Green v. Astrue*, No. 3-07-CV-0291-L, 2008 WL 3152990 at * 7-9 (N.D. Tex. Jul. 30, 2008) (same); *Stevenson v. Astrue*, No. 3-07-CV-269-N, 2008 WL 1776504 at *3-4 (N.D. Tex. Apr. 16, 2008) (same); *cf.* 20 C.F.R. § 404.1527(f)(3) (requiring that when the Appeals Council makes a decision, it must follow the same rules for considering medical opinion evidence that the ALJ must follow); SSR 96-5 (providing that adjudicators must weigh medical source statements and RFC assessments and "provide appropriate explanations for accepting or rejecting such opinions").

Dr. Sepdham's medical statement contained a new assessment of Plaintiff's condition which indicated that he would need to lie down two times a day, change positions every five minutes, and confirmed that he would probably miss more than three days of work a month. These are all conditions the VE indicated would preclude full time employment. "Conflicts in the evidence are for the Commissioner and not the courts to resolve." *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). Failure to discuss the medical source statement was prejudicial because had the Appeals Council properly considered it, the Appeals Council might have reversed the case and remanded it

24

for a new hearing.  The Appeals Council's standard form rejection of Plaintiff's new evidence is ambiguous and unpersuasive. Accordingly, this case should be remanded for further consideration in light of the new evidence Plaintiff submitted to the Appeals Council.

### Whether the ALJ's Credibility Assessment Is Based on Substantial Evidence

Plaintiff contends that the ALJ's credibility assessment, if one can be found, contained errors of law and was not based upon substantial evidence because the ALJ did not consider the majority of the objective medical evidence and assessments, as well as Plaintiff's reports and testimony. (Pl.'s Br. at 27-34.)  The Commissioner responds that the ALJ properly evaluated Plaintiff's credibility under a number of the required factors.  (Def.'s Br. at 19-21.)

"[T]he ALJ must consider subjective evidence of pain testified to by claimant and corroborated by others who have observed him." *Scharlow v. Schweiker*, 655 F.2d 645, 649 (5th Cir. 1981).  Moreover, "[f]ailure to indicate the credibility choices made and the basis for those choices in resolving the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints requires reversal and remand [of the ALJ's decision]." *Id*.  However, claimant's "statement as to pain or other symptoms shall not alone be conclusive evidence of disability."  42 U.S.C. § 423(d)(5)(A).  Rather, "there must be medical signs and findings . . . which show the existence of a medical impairment that results from . . . abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which . . . would lead to a conclusion that the individual is under a disability." *Id*.

In *Scharlow*, the ALJ failed to make *any* findings of credibility; however, the subsequent case of *Little v. Schweiker* interprets *Scharlow* as requiring the ALJ "to specifically address the credibility" of the claimant's corroborated testimony of subjective pain.  *Id*. at 649; *Little v.*

25

*Schweiker*, 555 F. Supp. 541, 547 (N.D. Tex. 1982).  This Court determines that the ALJ failed to comply with *Scharlow* and *Little* because the ALJ did not "specifically address the credibility" of Plaintiff's testimony or indicate "the credibility choices made and the basis for those choices." *Scharlow*, 655 F.2d at 649; *Little*, 555 F.Supp. at 547.

In this case, the ALJ made the conclusory statement that she had considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. 416.929 and SSR's 96-4p and 96-7p.  She also stated that she had considered the opinion evidence in accordance with the requirements of 20 C.F.R. 416.927 and SSR's 96-2p, 96-5p and 06-3p.  The ALJ stated that after careful consideration of the evidence, she found that "Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with [the ALJ's] residual functional capacity assessment."  The ALJ picked out only Dr. Bucholz's reports that Plaintiff was doing well in October, 2008 and Dr. Sepdham's report of December 2008 that Plaintiff continued to walk without a cane and reported leg pain due to driving.  The ALJ failed to mention the bulk of the more recent evidence from the treating physician that Plaintiff's pain continued to be so severe that Dr. Sepdham felt it was medically necessary to continue to prescribe narcotic pain medication for Plaintiff.  (Tr.  19.)  The ALJ also appears to impugn Plaintiff's credibility by reports of his "drug seeking behavior," and "substance abuse" without determining the credibility of Plaintiff's testimony that he discontinued substance abuse two months before the hearing and was passing regular laboratory tests ordered by the treating

physician.  The ALJ also failed to make a finding on whether the abuse was material to a finding of disability.

The ALJ goes on to find Plaintiff's asthma and depression non severe without discussing Dr. Sepdham's having prescribed amitriptyline for Plaintiff's depression, having raised the dosage, and having continued to prescribe amitriptyline for Plaintiff's depression and anxiety on a continuing basis.  (Tr.  19, 546, 572, 577, 582, 611, and 644.)  The ALJ simply notes Plaintiff's ability to get his children ready for school, wash dishes, and attend church without addressing Plaintiff's explanations of how he manages to do these things.  (Tr.  49-53.)  The ALJ appears to attempt to impugn Plaintiff's credibility with respect to the intensity of Plaintiff's pain with Plaintiff's plans to work out of town, which, as this Court has thoroughly discussed, were inconsistent with the ALJ's determination of Plaintiff's date last worked as November 14, 2007.  Further, the ALJ fails to discuss the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which the symptoms limit his ability to do basic work activities.  Additionally, except for the brief incomplete reference to Plaintiff's daily activities, the ALJ failed to discuss the seven factors listed in 20 C.F.R. § 404.1529(c)(4) in determining Plaintiff's credibility.

Finally, in determining Plaintiff's credibility, the ALJ failed to consider that Plaintiff followed all the prescribed treatment by multiple treatment sources, had hip replacement surgery, completed his physical therapy, and had multiple steroid injections in an attempt to relieve his severe chronic pain without prescription painkillers.  The ALJ's credibility determination is not supported by substantial evidence.  Plaintiff was prejudiced because if the ALJ had considered Plaintiff's credibility in accordance with the regulations, the result might have been different.

## Conclusion

27

The Court finds that the Commissioner's decision denying SSI benefits is not supported by substantial evidence and is the result of prejudicial legal error.  The ALJ and the Appeals Council failed to consider the treating physician's medical source statements in accordance with the regulations and rules.  The ALJ's credibility determination is flawed.  Moreover, it is not supported by substantial evidence and is not in accordance with the required regulations and rulings.

In light of this Court's recommendation that reversal and remand is required on these three grounds, the Court need not consider whether Plaintiff's other issues also require reversal and remand.  However, the Court notes certain matters that should be addressed more fully on reconsideration.  On remand, the Commissioner will necessarily reconsider Plaintiff's RFC in light of Plaintiff's total left hip replacement surgery and all of the medical treatment thereafter, including all of the medical source statements.  Additionally, the Commissioner should also consider whether Plaintiff's back impairment was a severe impairment and reconsider whether Plaintiff's depression was a severe impairment in light of his treating physician's treatment of Plaintiff's depression with prescription medication.  *See Stone*, 752 F.2d at 1101. The Commissioner should address the effect of Plaintiff's obesity in the RFC assessment, its effect in the assessment of Plaintiff's social functioning, and the effect of obesity combined with his other physical impairments.  Finally,  the Commissioner should consider Plaintiff's hip replacement under Listing 1.02 and *Aulder v. Astrue*, 501 F.3d 446, 448 (5th Cir.  2007).

### Recommendation

The Court recommends that the District Court reverse and remand this case for further consideration consistent with these findings and conclusions.

28

Signed, January 17, 2012.


_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a copy of these findings, conclusions and recommendation on the parties.  Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must serve and file written objections within fourteen days after service.  A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made.  The District Court need not consider frivolous, conclusory or general objections.  A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court.  *See Thomas v. Arn*, 474 U.S. 140, 150 (1985).  Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within fourteen days after service shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error.  *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).